IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 19, 2016 Session

**STATE OF TENNESSEE v. JONATHAN GUTIERREZ**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-505      Cheryl A. Blackburn, Judge**
_____

**No. M2015-01235-CCA-R3-CD – Filed May 24, 2017**
_____

The Appellant, Jonathan Gutierrez, was convicted in the Davidson County Criminal Court of one count of first degree premeditated murder and four counts of aggravated assault and received an effective sentence of life plus sixteen years in confinement. On appeal, he contends that the evidence is insufficient to support his murder conviction and two of his aggravated assault convictions, that the trial court committed plain error by failing to declare a mistrial when the State did not produce a codefendant's statement before trial, that the State committed plain error by giving improper closing argument, that the trial court erred by ordering consecutive sentencing, and that his life sentence is unconstitutional. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Richard C. Strong (on appeal) and Paul Walwyn (at trial), Nashville, Tennessee, for the appellant, Jonathan Gutierrez.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Bret Gunn and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In February 2008, the Davidson County Grand Jury indicted Alvin Gutierrez, Hector Lopez, and the then seventeen-year-old Appellant for the first degree

premeditated murder of Lucio Garcia and the aggravated assaults of April Lopez, Jennifer Lopez, Brittany Jones, and Crystal Rice. The Appellant filed a motion to sever his trial from that of his codefendants on July 16, 2010, and the trial court granted the motion on December 17, 2010.

At the January 2011 trial,[1] twenty-two-year-old Hector Lopez testified that he was a codefendant in this case and that he was testifying against the Appellant voluntarily. He said that he had not been promised anything in exchange for his testimony but acknowledged that he was hoping the State would take his testimony into consideration for his own case.

Hector[2] testified that at the time of the incident in question, he had been a member of Brown Pride, a street gang that was "[m]ainly Mexican," for one or two years. He said the gang was involved in "[r]obbery, selling drugs, and stuff like that" and had ongoing conflicts with other gangs such as "Bloods, MS-13, [and] South 13." South 13 was also known as "Surenos." At some point, Detective Mark Anderson, who worked in the Gang Unit of the Metropolitan Nashville Police Department (MNPD), stopped Hector for a traffic offense and asked if Hector would provide him with information about gang activity. Hector agreed and would contact Detective Anderson when he thought something bad was going to happen and he could prevent people from getting hurt.

Hector testified that the Appellant was also a member of Brown Pride, that he and the Appellant were "pretty close," and that he saw the Appellant almost every day. The Appellant had been a Brown Pride member for a longer period of time than Hector and lived on Thompson Lane near Murfreesboro Road with the Appellant's mother, brothers, and stepfather. About a year before the shooting in this case, the Appellant was shot in his right leg. The Appellant showed the wound to Hector and told Hector that "people [were] always like shooting at his house, like always riding by and shooting at his house." Hector said he was at the Appellant's home frequently and that he witnessed people "scream, sometimes they would show bandanas, sometimes they would scream obscenities at the house and stuff like that." Hector said people would drive by; "diss on" Brown Pride; and yell out their gang affiliations, which was mostly South 13 and MS-13. In the days leading up to Lucio Garcia's death, Hector saw a white or gray Mustang and a yellow Dodge truck driving by the Appellant's house.

---

[1] We note that the delay between the Appellant's trial and the direct appeal of his convictions resulted from trial counsel's failure to file a timely notice of appeal after the trial court denied the Appellant's motion for new trial on September 30, 2011. On October 5, 2015, this court granted the Appellant's motion to waive the timely filing of the notice of appeal.

[2] Because some of the witnesses and defendants share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

Hector testified that about 4:00 a.m. on August 26, 2007, he arrived at the Appellant's home with the Appellant; Michael Gutierrez, the Appellant's brother; Raul Rostro; and Alvin Gutierrez, the Appellant's cousin. All of them were Brown Pride members and had been to a party. Hector said he had just backed his mother's white Ford Escape into the Appellant's driveway and was still in the car with Rostro when the white Mustang passed by. Hector did not hear or see the people in the Mustang do anything. However, the Appellant told Hector that they had screamed "South 13" and that the Appellant was "tired of people driving by his house and always shooting it up." Hector acknowledged that the Appellant was "mad." The Appellant and Alvin got into the Escape, and the Appellant told Hector to "drive."

Hector testified that he drove the Escape toward the Mustang. Alvin was in the front passenger seat, Rostro was sitting behind Hector, and the Appellant was sitting behind Alvin. Hector said he was driving about sixty-five miles per hour in the residential area and caught up to the car. The Appellant passed his gun forward to Alvin, Alvin leaned his torso out the front passenger window, and Alvin fired three or four shots at the Mustang. Hector said that he did not see any of the bullets hit the Mustang and that he continued to chase it. The cars eventually drove out of the residential area and turned onto Interstate 440 and then Interstate 65. Hector said that Alvin "pulled the back of the gun too many times . . . and he had dropped some bullets, and then he thought he didn't have anymore." The Appellant told Alvin to give him the gun. Alvin handed the gun to the Appellant, and the Appellant said that "he had one left."

Hector testified that he began passing the driver's side of the Mustang on Interstate 65. When the Appellant's window was beside the driver's window of the Mustang, Hector heard a final gunshot. He then heard the Appellant say that "he aims before he shoots." Hector said that the Mustang "kept on driving," that he did not know anyone in the Mustang had been shot, and that he drove back to the Appellant's house. The Appellant told Hector to drive Rostro "to get some more bullets just in case they were going to come back," and Hector did so.

Hector testified that he did not know how many people were in the Mustang but that he could see the driver was a male. No one in the Mustang ever leaned out of the car or yelled anything while the Escape was chasing it. Hector said he learned someone had been killed when Detective Anderson came to his home and asked him about the incident. At first, Hector denied being involved. However, he admitted his involvement the next day and named the other people in the Escape. The police seized the Escape, and Hector's mother gave Detective Anderson two cartridges she had found in the vehicle. Due to Hector's relationship with Detective Anderson, the police did not arrest Hector immediately. He was later indicted with the Appellant, though, and spent about eight months in jail. In return for his cooperation and expected testimony against the

Appellant, the State recommended that his bond be lowered, and he was released from confinement. He said that at the time of the Appellant's trial, he had been out of jail about three years and was doing his "best" to avoid Brown Pride members. He said he did not know Lucio Garcia and had never seen him prior to August 26, 2007.

On cross-examination, Hector testified that on August 26, 2007, he was nineteen years old. Prior to the shooting, he and the four other males had been to a party and then a bar, and Hector had consumed thirteen or fourteen beers in six or seven hours. He said the Appellant "doesn't like to drink" and had consumed one beer. Everyone left the bar about 3:00 a.m. and returned to the Appellant's home. No one had gone inside the house when the Mustang drove by the house.

Hector acknowledged that he did not tell Detective Anderson the truth about the shooting the first or second time he spoke with the detective and that he claimed Michael Gutierrez had been driving the Escape. However, he told the truth when he learned someone had been killed and when the police told him that Michael, as the driver of the Escape, was in trouble. He explained, "And so I had to tell [Detective Anderson] the truth because [Michael] was not the one that was driving." Defense counsel asked if Hector actually saw the Appellant hand the gun to Alvin, and Hector answered, "I saw the hand going to the front." He acknowledged that Alvin fired the first three or four gunshots, that he heard the final gunshot when the cars were on the interstate, and that he did not know which bullet struck Mr. Garcia.

Jennifer Lopez testified that she was eighteen years old and no relation to Hector Lopez. In August 2007, she was fifteen and had been dating Lucio Garcia about six months. Mr. Garcia was nineteen, and Jennifer had never known him to affiliate with gang members. She said that she had known the Appellant for about one and one-half years and that he was a member of Brown Pride. She also knew he lived on Thompson Lane.

Jennifer testified that in the early morning hours of August 26, she was out with Mr. Garcia; her younger sister, April; Brittany Jones; and Crystal Rice. They had been to a movie; a place to play pool named "Snookers"; and then Jennifer's home. They left Jennifer's residence in Mr. Garcia's white Ford Mustang and traveled on Thompson Lane, but Jennifer did not remember where they were going. Mr. Garcia was driving, Jennifer was sitting in the front passenger seat, and the three other girls were in the back seat.

Jennifer testified that she did not do anything as the Mustang passed the Appellant's house and that she did not remember if anyone else in the car did anything. About two minutes later, April told Jennifer that "they were following us." Jennifer did

not know who was in the other vehicle or from where it came. The vehicle caught up to the Mustang, and someone in the other vehicle fired two gunshots. The shots hit the back of the Mustang but no one inside. Jennifer said Mr. Garcia sped up and was driving eighty miles per hour, trying to get away. Eventually, he turned onto Interstate 440 and then Interstate 65.

Jennifer testified that the other vehicle caught up to the Mustang on Interstate 65. As it pulled alongside the Mustang, Mr. Garcia told Jennifer to "get down." A gunshot was fired seconds later, but Jennifer did not hear it. April told her that Mr. Garcia had been shot and to grab the steering wheel. Jennifer did not see any blood on Mr. Garcia, but his head was down to his chest. She grabbed the steering wheel and then her sister grabbed it while Jennifer lifted Mr. Garcia's foot off the accelerator. They pulled onto an exit ramp, and Jennifer saw blood. She stated that Mr. Garcia's window was up during the incident and that no one ever leaned out of the Mustang or held anything out of it. She acknowledged that she was placed in fear by the gunshots and said that she had not seen Jones or Rice since the shooting. She did not know if they were still in the Nashville area.

On cross-examination, Jennifer testified that at the time of the shooting, her sister April was thirteen and was good friends with Mr. Garcia. No one had been drinking alcohol or smoking marijuana prior to the incident. She said that the Mustang's door windows were "cracked" open but were not all the way down and that she did not see anyone standing outside the Appellant's house as the Mustang passed it. Mr. Garcia was driving the speed limit of forty miles per hour through the Appellant's neighborhood. However, when the other vehicle began following them, Mr. Garcia began driving "[r]eally fast." She said that she heard two gunshots and that the girls in the back seat "ducked" down. She acknowledged that when they got onto the interstate, Mr. Garcia told her to "get down." She said she never saw anyone shooting at the Mustang.

April Lopez testified that she was sixteen years old and living in a juvenile detention facility for stealing a car. She also had committed robbery. In August 2007, April knew Lucio Garcia as her sister's boyfriend and as a member of South 13. She said he always carried a blue flag, which she acknowledged was the gang's "colors." The Appellant was a member of Brown Pride, and the two gangs did not get along.

April testified that in the early morning hours of August 26, she, her sister, and two friends were riding with Mr. Garcia in his car. April was sitting behind Mr. Garcia, and they were taking Crystal Rice to her boyfriend's house. As the car passed the Appellant's house, April saw one person getting into a car and yelled, "[F***] y'all [b****es]." She said that she did not know why she yelled the statement, that she regretted doing so, and that "[t]hey pulled out, and they started shooting at us." She

heard four gunshots. She did not know if any of the bullets hit the Mustang, but the bullets did not hit anyone inside the car, and Mr. Garcia continued driving. April had her head down but lifted her head when she felt the Mustang slowing. Mr. Garcia's head was on the steering wheel, so April pulled the emergency brake. The girls pulled the car off the interstate, and it finally came to a stop. April said she was afraid during the shooting and that she did not see or hear the final gunshot.

On cross-examination, April testified that she was thirteen years old at the time of the shooting and considered Mr. Garcia to be one of her best friends. She acknowledged that when the Mustang passed the Appellant's house, the person she saw outside was the Appellant and that she yelled in a deep voice, "Hey Jonathan." She then yelled "[F***] y'all [b****es]." She said she leaned forward and yelled the statements out of the driver's window, which was "cracked" open, and that the Appellant's house was on the driver's side of the Mustang. A vehicle with its lights on was at the Appellant's house.

April testified that "I just looked back, and then I seen the car pull out. And then one shot fired and then kept going on and on." When the Mustang got out of the residential area, April told Mr. Garcia to pull into a gas station because she did not think the people in the other car would continue shooting at the Mustang in a public place. However, Mr. Garcia did not listen to her and kept driving. She said that he was driving "100, 120" miles per hour on the interstate and that he almost lost control of the car. She stated that she had her head down "[t]he whole time" and that she pulled the emergency brake and grabbed the steering wheel when she felt the Mustang slowing down. The girls called 911, and it took about thirty minutes for law enforcement to arrive. April acknowledged that she "[made] up stuff" when she talked with the police.

After April's testimony, the State played portions of a May 13, 2009 video-recorded interview the Appellant gave to the History Channel for its television series, Gangland. During the interview, the Appellant, wearing clothing that appeared to be an orange prison jumpsuit, stated that he loved his fellow gang members like brothers and that he hid what he did in the gang from his mother. He said that Brown Pride "beefed" with Surenos anytime they saw each other and that "I always have my gun on me, any point in time." The Appellant said that Surenos members shot at his house twice and that Brown Pride members retaliated for the shootings.

The interviewer asked the Appellant about the shooting in this case, and the Appellant said he and his friends had just pulled into his driveway when the other car drove by his house. The Appellant stated that the people in the other car "just started disrespecting us, saying all kinds of stuff" and that he did not know who was in the car. The interviewer asked, "What did you do then?" The Appellant answered, "Did what we had to do." He said that he was in a car with three other males and acknowledged that

they "chased down" the other car. He stated that the other car "basically waited for us" and that no one in the other car shot at the car he was in. He then stated as follows:

> Everything happened so quick. . . . How it look, like if it was in your position, you get behind me, I'm a gamer and you [in] a different gang. You get behind me. If I come to your house, roll up to you, of course you going to come at me. Me and my homeboys going to stop at a light and wait for you, huh? Soon as I stick my head out, what you going to think? You going to think I'm fixing to shoot you. So things happen.

The Appellant said that he did not know "that guy," meaning Lucio Garcia, and that the females in the car were "hood rats." The interviewer asked if the Appellant had his gun at the time of the incident, and he said no. He acknowledged that he thought the people in the other car were going to harm him.

Detective Jacob Pilarski testified that in August 2007, he was a patrol officer with the MNPD. On August 26, he responded to a "possible shooting" call and went to the Wedgewood Avenue entrance ramp on Interstate 65. He arrived within two minutes and was the first officer on the scene. A white Mustang was in a ditch, and the back of the car was "cocked up" so that its left rear tire was off the ground. Detective Pilarski said that somebody was yelling that "they shot him, they shot him" and that the scene was "very frantic." The driver's door window had been shot out, Mr. Garcia was slumped over the steering wheel, and Detective Pilarski saw a large amount of blood. He said that he had Jennifer Lopez write out a statement and that paramedics arrived and removed Mr. Garcia from the scene.

Detective Mark Anderson of the MNPD's Gang Unit testified that Surenos and Brown Pride were rival gangs. He stated that "some weeks prior" to this incident, the Gang Unit stopped a vehicle and arrested several gang members, including Hector Lopez. Detective Anderson said that he spoke with Hector and that Hector "seemed willing at times to maybe talk to me and actually provided me a telephone number." Thereafter, Detective Anderson would talk with Hector from time to time.

Detective Anderson testified that Lucio Garcia's name was not in the police department's gang database. On August 26, 2007, Detective Anderson responded to a possible gang-related shooting near Interstate 65 and Wedgewood Avenue and learned that Garcia, a member of Surenos, had been killed. Detective Anderson spoke with Jennifer Lopez, April Lopez, Crystal Rice, and Brittany Jones and determined from their information that Brown Pride members were involved in the shooting.

Detective Anderson testified that he telephoned Hector and asked Hector about a white Jeep Cherokee possibly involved in the shooting. Hector "volunteered" that his mother owned a white Ford Escape, which Detective Anderson thought was an unusual statement. Detective Anderson explained to the jury that the two vehicles looked similar, "especially at night." He later spoke with Hector in person. At first, Hector denied any involvement with the shooting. About twelve hours later, though, Hector admitted that he was the driver of the Escape. Hector's mother gave the police consent to search the Escape and gave Detective Anderson two live, nine-millimeter rounds she had found in the vehicle. The police seized the Escape and transported it to the identification laboratory.

Jenness Schumann testified that she used to work for the MNPD as a crime scene technician and that she processed the Escape for evidence on August 26, 2007. She photographed the vehicle; dusted it for fingerprints; and "swab[ed]" areas of the vehicle, including a reddish-brown "spattering" stain on the hood. Schumann found a Winchester nine-millimeter Luger cartridge on the rear, passenger-side floorboard.

Dr. Amy McMaster, the Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that she did not perform Lucio Garcia's autopsy but that she was present during the autopsy and reviewed the autopsy report. The victim received a gunshot wound to his face and neck. The bullet entered the left side of his face at the jawline and traveled left to right, front to back, and slightly downward. The bullet moved through his neck, spinal cord, and spine, and a portion of the bullet and bullet jacket were recovered in his spine. Dr. McMaster said that the wound was fatal and that death was immediate or almost immediate. The cause of death was a gunshot wound to the face and neck, and the manner of death was homicide. The victim's toxicology tests were negative for alcohol and drugs.

Brad Corcoran testified that in August 2007, he was a detective with the MNPD and participated in the Appellant's arrest on August 26. Mr. Corocran asked the Appellant where the gun was located, and the Appellant said he had thrown it into a river. However, no river was nearby, and the Appellant eventually told Mr. Corcoran that he had put the gun in the woodline behind his house. After the Appellant's arrest, Mr. Corcoran walked behind the house and saw a five-gallon bucket turned upside down. He said that "what appeared to be a magazine to a firearm" was sticking out from underneath the bucket. Mr. Corcoran lifted the bucket and found two weapons: a pellet gun and a KG-99 nine-millimeter semiautomatic pistol. He said "a couple of magazines" were with the pistol, one of which was in the gun. The Appellant never admitted being involved with the shooting and claimed he was not present.

Sergeant Danny Orr of the MNPD testified that he "swabbed the trigger area and the grip" of the nine-millimeter pistol found by Mr. Corcoran and that he tried to find fingerprints on the gun and magazines. He developed a partial fingerprint on one of the magazines.

Laura Boos, a special agent with the Tennessee Bureau of Investigation (TBI) Crime Laboratory, testified as an expert in serology and DNA analysis that she analyzed evidence collected in this case and compared it to known samples collected from Mr. Garcia and the Appellant. The swab from the hood of the Escape showed the presence of blood, and the blood was that of Mr. Garcia. A swab from the side-mirror on the driver's side of the Escape was positive for blood and DNA and was consistent with a mixture of genetic material from two individuals. However, Dr. Boos obtained only a very limited DNA profile from the material. She was able to exclude the Appellant as one of the contributors but not Mr. Garcia. A swab from the nine-millimeter pistol did not show the presence of blood but showed the presence of DNA. The DNA sample was too small for her to obtain a profile.

Don Carman, a special agent with the TBI Crime Laboratory, testified as an expert in firearms identification that he analyzed evidence collected in this case, including the portions of the bullet and bullet jacket recovered during Mr. Garcia's autopsy and the nine-millimeter semiautomatic pistol found by Mr. Corcoran. Agent Carman test-fired the pistol and compared the test-fired bullet to the bullet jacket recovered from the victim. He concluded that the bullet jacket was fired through the barrel of the pistol.

At the close of Agent Carman's testimony, the State rested its case, and the Appellant did not present any proof. The jury convicted him as charged of the first degree premeditated murder of Mr. Garcia and the aggravated assaults of Jennifer Lopez, April Lopez, Brittany Jones, and Crystal Rice. The trial court immediately sentenced him to life for the murder conviction. After a sentencing hearing, the court sentenced him to four years for each aggravated assault conviction and ordered that the sentences be served consecutively to each other and the life sentence for a total effective sentence of life plus sixteen years.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his conviction for the first degree premeditated murder of Lucio Garcia because the evidence fails to show he was the actual shooter and because the only evidence about what happened inside the Escape came from the uncorroborated testimony of Hector Lopez. He also

contends that the evidence is insufficient to support his convictions for the aggravated assaults of Brittany Jones and Crystal Rice because the State "failed to show that Ms. Rice and Ms. Jones [were] even aware that the assault was occurring" and because the girls "very well could have been asleep." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. <u>State v. Davidson</u>, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. <u>Bland</u>, 958 S.W.2d at 660. As charged in this case, aggravated assault occurs when a defendant

intentionally or knowingly causes another reasonably to fear imminent bodily injury and uses or displays a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(B) (2007).

The Appellant is correct in that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). As our supreme court has explained,

> "There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). "Whether sufficient corroboration exists is a determination for the jury." Shaw, 37 S.W.3d at 903.

Here, Hector Lopez testified as follows: He and Rostro were sitting in the Escape in the Appellant's driveway when the Mustang passed by the Appellant's house. The Appellant came to the Escape and told Hector that the people in the Mustang had screamed "South 13." The Appellant and Alvin Gutierrez got into the Escape, the Appellant told Hector to "drive," and they began chasing the Mustang. Alvin fired three or four shots at the car, "dropped some bullets," and gave the gun to the Appellant. The Appellant fired a final shot on Interstate 65. Hector's testimony was almost entirely corroborated by April Lopez, who stated that she saw a vehicle with its lights on at the Appellant's home, that she saw the Appellant outside, that she yelled a disparaging remark out of the Mustang, that "[t]hey pulled out, and they started shooting at us," and

that the final shot occurred on the interstate. Moreover, Hector's mother and the police found unfired rounds in the Escape.

The State did not have to prove that the Appellant was the person who actually shot Mr. Garcia in order for the evidence to be sufficient to sustain his murder conviction because the record reflects that the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). From the evidence presented at trial, we have no hesitation in concluding that the evidence is sufficient to support the conviction.

As to the Appellant's claim that the evidence is insufficient to support his convictions for the aggravated assaults of Brittany Murphy and Crystal Rice, he notes that neither girl testified at trial. Regardless, "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. at Jackson, May 8, 1998). "Fear may be proved by circumstantial evidence, and a victim does not have to testify in order for the State to establish that the victim was in fear." State v. Charles Clevenger, No. E2012-01119-CCA-R3-CD, 2013 WL 2566191, at *7 (Tenn. Crim. App. at Knoxville, June 7, 2013) (citing State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008)).

In this case, Jennifer Lopez testified that she heard two gunshots and that the girls in the back seat "ducked" down. April Lopez, who was sitting in the back seat with Brittany Murphy and Crystal Jones, testified that she was scared during the shooting and that she had her head down "[t]he whole time." Clearly, a rational jury could have inferred that all three girls ducked down due to their imminent fear of being shot. The evidence is sufficient to support the convictions.

B. Codefendant's Statement

- 12 -

Next, the Appellant contends that the trial court committed plain error by failing to produce a statement during discovery that was made by Hector Lopez. During oral arguments, the Appellant also claimed that the statement was discoverable as his own statement. The State asserts that the Appellant is not entitled to plain error relief. We agree with the State.

Before trial, the Appellant filed a motion for discovery pursuant to Rule 16, Tennessee Rules of Criminal Procedure, and Brady v. Maryland, 373 U.S. 83 (1963), that included "[t]he substance of any conversation between the State and Hector Lopez." During opening statements, the State said, "[A]nd we know that [the Appellant] aimed because Mr. Lopez is going to tell us that that's exactly what [the Appellant] said, kind of like, here, see what I did, I aimed when I shot, talking to Alvin who hadn't hit anything when he was shooting from behind." During Hector Lopez's direct testimony, he testified that the Appellant fired the final shot at the Mustang and that he heard the Appellant say that "he aims before he shoots."

After the State rested its case, defense counsel moved for judgment of acquittal. In denying the motion, the trial court noted that as part of the State's evidence against the Appellant, "[Hector Lopez] heard a shot fired. And after that, he heard the defendant say he aims before he shoots." After the trial court's ruling, defense counsel asked if Lopez made the statement before trial and, therefore, if the statement was discoverable. Defense counsel advised the court that the statement was not in any of the discovery materials received by the Appellant and that "I'm just asking if that was something [the State] knew about." The State acknowledged that it knew about the statement before trial but said that "I don't have to disclose to the defense attorney everything the person says unless it's exculpatory in some manner." The trial court replied, "Okay. So there's really nothing they can do about it anyway at this point in time because it [is not] exculpatory."

The Appellant contends that the State was required to produce the statement before trial pursuant to Rule 16(a)(1)(D), Tennessee Rules of Criminal Procedure, and that the trial court should have declared a mistrial when the State failed to do so. However, the State first mentioned the statement during its opening statement, and the Appellant did not object. The Appellant also did not object during Mr. Lopez's testimony and never requested a mistrial. See Tenn. R. App. P. 36(a) (nothing in the rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error). Finally, he did not raise this issue in his motion for new trial. See Tenn. R. App. P. 3(e). Therefore, the issue is waived.

The Appellant requests that we review the issue for plain error. We may consider an issue as plain error when all five of the following factors are met:

- 13 -

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also Tenn. R. App. P. 36(b). Furthermore, the ""plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Id. at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). It is the appellant's burden to demonstrate plain error. State v. Gomez, 239 S.W.3d 722, 727 (Tenn. 2007). We do not need to consider all five factors if we determine that a single factor does not warrant relief. State v. Smith, 24, S.W.3d 274, 283 (Tenn. 2000).

Tennessee Rule of Criminal Procedure 16, which addresses the pretrial discovery and inspection of evidence, provides as follows:

> Upon a defendant's request, when the state decides to place codefendants on trial jointly, the state shall promptly furnish each defendant who has moved for discovery under this subdivision with all information discoverable under Rule 16(a)(1)(A), (B), and (C) as to each codefendant.

Tenn. R. Crim. P. 16(a)(1)(D). The Appellant argues that the Rule applies at the time of the indictment, rather than on the morning of trial, because otherwise it would prevent defendants from knowing if a "Bruton problem"[3] exists. We disagree. The Advisory Commission Comments to Rule 16 provide that if a defendant and codefendant are scheduled to be tried jointly, a codefendant's statements "may be reviewed to determine whether or not a severance . . . need be sought." However, if the trial court already has granted a severance, as in this case, the need to review a codefendant's statements for severance purposes no longer exists. Moreover, this court has stated that according to the plain language of Rule 16(a)(1)(D), it only applies when defendants are tried jointly. See State v. Lawrence D. Ralph, Jr., No. M2009-00729-CCA-R3-CD, 2010 WL 457496, at *6 (Tenn. Crim. App. at Nashville, Feb. 10, 2010). Accordingly, we cannot say that a

---

[3] In Bruton v. United States, 391 U.S. 123, 126 (1968), the United States Supreme Court held that allowing into evidence a codefendant's statement that implicated the defendant when the codefendant did not testify violated the defendant's right to confrontation.

- 14 -

clear and unequivocal rule of law was breached and conclude that the Appellant is not entitled to plain error relief.

As to the Appellant's claim that the statement was discoverable as his own statement, Tennessee Rule of Criminal Procedure 16(a)(1)(A) provides that upon a defendant's request, the State must disclose "the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial." Nothing indicates that the Appellant's statement "he aims before he shoots" was made in response to interrogation by law enforcement. Tennessee Rule of Criminal Procedure 16(a)(1)(B) generally provides for the State's disclosure of a defendant's written or recorded statement. However, appellate counsel stated at oral arguments that he did not know if the Appellant's statement was written or recorded, and nothing indicates that the Appellant's oral statement was ever reduced to writing. Thus, we again cannot say that a clear and unequivocal rule of law was breached by the State's failing to disclose the statement.

## C. Closing Argument

The Appellant contends that the State's closing argument urged the jury to convict him based on his gang membership, not his actions in this case, and was "so intemperate" as to warrant reversal of his convictions. The State argues that the Appellant is not entitled to relief. We agree with the State.

Initially, we again note that the Appellant failed to make a contemporaneous objection to the prosecutor's argument or raise this issue in his motion for new trial. See Tenn. R. App. P. 3(e), 36(b). The Appellant requests that we review the issue for plain error.

The Appellant contends that the State committed prosecutorial misconduct by arguing as follows:

> The first thing I want to talk to y'all about is gangs. . . . I think between the testimony that you heard from Mr. Hector Lopez and in particular the interview that Mr. Jonathan Gutierrez had with the folks from the History Channel should have educated you a little bit about what they're about. And what they are about is violence and retaliation. I mean, you can see that in Mr. Gutierrez talking about the lifestyle that he led and the mindset that he had. That's what it was about. I mean, how does it start? You know, somebody is walking in

- 15 -

somebody's territory that they think is theirs, so then somebody goes to that person's territory and does some graffiti, then somebody marks out that graffiti and somebody catches them so they beat them up and then somebody goes back and takes a shot at somebody's house and then somebody finds somebody out on the street and they kill them. It's just retaliation back and forth. It is completely and utterly senseless. When they asked Mr. Gutierrez how did this all get started, why did the Surenos not like ya'll, he didn't really have an answer for that. He said, oh, man, just hating on us. They don't know why they don't like each other. They don't know why they don't get along except when you start an organization built on violence and you retaliate for things it escalates.

In order to prevail on a claim of prosecutorial misconduct, an appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial

comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Turning to the instant case, we agree that some of the prosecutor's specific statements were not supported by the evidence. For example, there was no testimony regarding retaliation for graffiti and killing rival gang members on the street. However, the prosecutor's general argument was based on evidence presented at trial. Hector Lopez testified about Brown Pride's criminal activity and its rivalry with other gangs, including Lucio Garcia's gang, Surenos. In the Appellant's interview with the History Channel, he stated that Brown Pride members retaliated when rival gangs shot at his house, and he acknowledged that he and his fellow gang members chased the Mustang for nothing more than riding by and "disrespecting us." He also described a scenario in which a shooting could occur if a rival gang member simply "roll up to you." Therefore, we cannot say that the prosecutor's argument was improper. Moreover, the State's evidence against the Appellant was strong. Accordingly, we conclude that he is not entitled to plain error relief.

D. Consecutive Sentencing

- 17 -

The Appellant contends that the trial court erred by ordering consecutive sentencing. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, Lee Hockaday acknowledged that he was the court-appointed interpreter for "Spanish speakers." He read aloud the victim impact statements filled out by Lucio Garcia's parents. Mr. Garcia's mother wrote that the victim's death was "tremendous" and that she wanted to die with him. She stated that there was no treatment for her pain, that she and her husband did not work for ten days after his death, and that the Appellant took from her "the most valuable thing I had." She said that she wanted the Appellant to be punished "for life" and that she was worried he would be released and do harm to other innocent people. The victim's father wrote that the victim was "a great hardworking young man," very respectful, and "not like they saying involved in gangs." He said the victim "didn't cause problems for anybody" and wanted to build his parents a house in Mexico. He stated that the victim's mother "almost went crazy" after the victim's death and that the family was "still suffering."

The State introduced into evidence the Appellant's entire interview with the History Channel and his presentence report. In the report, the then twenty-year-old Appellant stated that he was born in Mexico, that he had three brothers and one sister, and that he had not had any contact with his father for nine years. He said in the report that he was expelled from high school his freshman year for fighting and that he was referred to an alternative school but never earned his high school diploma or GED. He also said he did not have any mental or physical issues and denied any history of using non-prescribed or illegal drugs. The report showed no employment history for the Appellant. According to the report, the Appellant had juvenile adjudications for driving without a license, weapon and alcohol possession, assault, resisting arrest, and "unruly-curfew."

The trial court noted that during the Appellant's interview with the History Channel, he talked about carrying a weapon. Thus, the court found that enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," applied to his sentences. Tenn. Code Ann. § 40-35-114(1). The trial court also applied factor (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). Defense counsel argued that the trial court should mitigate the Appellant's sentence due to his age, but the trial court found no mitigating factors applicable and sentenced the Appellant to four years for each aggravated assault conviction, a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(3).

Regarding consecutive sentencing, the trial court found that "[c]learly he is a dangerous offender." The trial court noted that the defendants "chased down" the Mustang and that the Appellant shot at the car, striking the victim in the neck. The trial court also noted that during the Appellant's interview with the History Channel, he referred to the girls in the car as "hood rats," "[s]o his total disregard for life comes out in his statement about that." The court specifically addressed the "Wilkerson factors" and found that although the Appellant was young, "his attitude and his behavior on this particular case clearly shows that the aggregate term must be a consecutive sentence" and that "it is necessary in order to protect the public from further serious criminal conduct by the defendant." Thus, the trial court ordered that the Appellant serve the four-year sentences consecutively to each other and the life sentence for a total effective sentence of life plus sixteen years.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40–35–102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of

> mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S .W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The trial court found that consecutive sentencing was appropriate because the Appellant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). "Where . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority" and can either conduct a de novo review to determine if an adequate basis exists for consecutive sentences or remand the case to the trial court for consideration of the requisite Wilkerson factors. Pollard, 432 S.W.3d at 864-65.

The Appellant contends that in ordering consecutive sentencing, the trial court "gave no indication why his youth did not affect his substantial judgment in this case." To the extent the Appellant is arguing that the trial court should have applied mitigating factor (6), that "[t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense," the Appellant had been a member of Brown Pride for years at the time of this incident, and he continued to be a member despite rival gang members shooting at his family's residence and his having been shot in the leg. On the night in

- 20 -

question, he ordered Hector Lopez to follow the Mustang, handed his gun to Alvin Gutierrez so that Alvin could shoot at the Mustang, and then shot at the Mustang himself when Alvin could no longer fire the weapon. Thus, although the Appellant had just turned seventeen years old at the time of the crimes, the trial court did not abuse its discretion by failing to apply mitigating factor (6).

The Appellant also contends that the court failed to explain "why any sentence more than the life sentence already imposed would be necessary to protect the public fifty-one years from now when Mr. Gutierrez would be eligible for release on the life sentence." However, the trial court specifically addressed the Wilkerson factors and found that consecutive sentencing was necessary to protect the public from further misconduct by the Appellant and that consecutive sentencing was reasonably related to the severity of the offenses. Thus, we conclude that the court did not err by ordering consecutive sentencing.

### F. Life Sentence

In a related argument, the Appellant contends that his effective sentence is "tantamount" to imposing a sentence of life without parole and, therefore, violates Miller v. Alabama, 132 S. Ct. 2455 (2012). He also claims that the sentencing statute for first degree murder violates Miller because it fails to give a trial court an opportunity to sentence a juvenile to anything less than life. The State argues that the Appellant's sentence does not violate Miller. We agree with the State.

In Miller, the United States Supreme Court held that a mandatory sentence of life without the possibility of parole for juvenile offenders violated the United States Constitution's Eighth Amendment prohibition against cruel and unusual punishment. 132 S. Ct. at 2464. This court has repeatedly rejected the argument that a juvenile's mandatory life sentence, which requires fifty-one years before release, is effectively a sentence of life without the possibility of parole. Martez D. Matthews v. State, No. M2015-02422-CCA-R3-PC, 2016 WL 7395674, at *4 (Tenn. Crim. App. at Nashville, Dec. 21, 2016); Charles Everett Lowe-Kelley v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *8 (Tenn. Crim. App. at Nashville, Feb. 24, 2016), perm. to appeal denied, (Tenn. June 23, 2016); Cyntoia Denise Brown v. State, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. at Nasvhille, Nov. 6, 2014), perm. to appeal denied, (Tenn. May 15, 2015).

Furthermore, as this court has noted, the Supreme Court in Miller did not hold that a juvenile could never be sentenced to life without the possibility of parole. Charles Everett Lowe-Kelley, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *9 (citing Miller, 132 S. Ct. at 2469). Instead, the Supreme Court required "a certain process—

considering an offender's youth and attendant characteristics—before imposing a particular penalty." <u>Miller</u>, 132 S. Ct at 2471; <u>see</u> <u>Cedrick Dickerson v. State</u>, No. W2013-01766-CCA-R3-PC, 2014 WL 3744454, at *5 (Tenn. Crim. App. at Jackson, July 28, 2014) (holding that defendant's sentence of life without parole did not run afoul of <u>Miller</u> when the record demonstrated that "the trial court "provided the exact consideration that the Supreme Court called for in <u>Miller</u>"), <u>perm. to appeal denied</u>, (Tenn. Nov. 19, 2014).

Here, the trial court addressed the Appellant's age during the sentencing hearing, stating,

> [Defense counsel]'s indication that because of youth he lacked substantial judgment in committing the offenses, that's clearly not borne out by the evidence in this case. He knew exactly what he was doing, had the gun, chased them down. And as he testified, or the statement we did what we had to do, they disrespected us and therefore we had to do it.
>
> . . . .
>
> The defendant is a young man, however, his attitude and his behavior on this particular case clearly shows that the aggregate term must be a consecutive sentence.

Therefore, even assuming arguendo that the Appellant's sentence of life plus sixteen years is tantamount to a sentence of life without parole, the trial court considered the Appellant's youth at the time of the crimes and determined that the sentence was appropriate. <u>See</u> <u>Charles Everett Lowe-Kelley v. State</u>, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *9 (Tenn. Crim. App. at Nashville, Feb. 24, 2016) (affirming defendant's consecutive life sentences and noting that <u>Miller</u> did not hold that a juvenile can never be sentenced to life without the possibility of parole), <u>perm. to appeal denied</u>, (Tenn. June 23, 2016). Accordingly, we conclude that he is not entitled to relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 22 -